IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Connor J., through his                          :
Parents, Kevin J. and Katherine J.              :
of Kennett Square, PA 19348                     :
                                                :
                                                :       Civil Action
              Plaintiff                         :
v.                                              :       No.
                                                :
Kennett Consolidated School District            :
300 East South Street                           :
Kennett Square, PA 19348                         :
                                                :
              Defendant                         :

## **COMPLAINT**

### I.   **Preliminary Statement**

1.     Connor J., a minor child with disabilities ("Connor" or "Student"), and his parents ("Parents"), Katherine J. and Kevin J. (collectively referred to as "Plaintiff" or "Family"), bring this action against Kennett Consolidated School District ("District" or "Defendant") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.     Connor is currently a sixth-grade student in the District's schools. He has been diagnosed with dual Post-Traumatic Stress Disorder, Separation Anxiety Disorder, Disruptive Mood Dysregulation Disorder, Attention Deficit Hyperactivity Disorder ("ADHD") – Combined Type, Dysautonomia, Snow Syndrome, and feeding disorders. Additionally, he displays a phonological-core deficit characteristic of Dyslexia, which significantly impedes his reading. He received

1

special education throughout his time in the District. From 2017 to 2019, the District determined that Connor was eligible under IDEA's Other Health Impairment ("OHI") classification only, because it failed to obtain reliable data of Connor's academic achievement. It was not until November 2019 that the District finally thoroughly analyzed Connor's academic skills, including his reading, math, and written expression skills, and concluded that his primary disability classification is Specific Learning Disability ("SLD") due to his significant deficits in reading.

3.      Throughout Connor's time in the District, his Individualized Education Programs ("IEPs") have, *inter alia*, failed to meet his needs and been inappropriately implemented. Connor's disabilities require, among other supports, in-person and one-on-one support to enable him to make meaningful educational progress. Consequently, Connor struggled significantly with remote learning during the COVID-19 pandemic and required in-person support to access his program, which the District did not provide until well into the 2020-2021 school year.

4.      On February 12, 2021,[1] the Family filed an administrative due process complaint, seeking compensatory education arising from the District's failure to provide Connor with an appropriate program under the IDEA and Section 504 for the 2017-2018, 2018-2019, and 2019-2020 school years, as well as the start of the 2020-2021 school year, through the implementation of Connor's IEP dated November 25, 2020.

5.      On April 19, 2021, June 1, 2021, and June 2, 2021, Pennsylvania Hearing Officer ("Hearing Officer") Cathy A. Skidmore conducted the due process hearing. In a decision dated July 15, 2021 ("Decision"), the Hearing Officer held that the District denied Connor a free appropriate public education ("FAPE") under the IDEA and Section 504 during portions of the 2019-

---

[1] The Parents subsequently filed an amended administrative complaint on February 23, 2021 with permission from the Hearing Officer. (Decision at 23 n.7).

2020 and 2020-2021 school years, and awarded five hours of compensatory education per school day from May 2020 to the end of the 2019-2020 school year and from the start of the 2020-2021 school year through the date of Connor's eligibility to return to in-person instruction in the District's schools. (Decision at 32). Additionally, the Hearing Officer held that the District deprived Connor of a FAPE during the summer, i.e., Extended School Year ("ESY") of 2020 and awarded 60 hours of compensatory education. *Id.*

6.      Although the Hearing Officer correctly concluded that the District denied Connor a FAPE during the 2019-2020 and 2020-2021 school years and ESY 2020, the Hearing Officer erred when she misapplied the statute of limitations to limit Parents' claims to the two years immediately preceding the due process complaint; failed to find a denial of FAPE from February 2019 – the start of the incorrect two-year look back – to January 2020; awarded compensatory education for only a portion of the time that Connor was deprived consistent Personal Care Assistant ("PCA") services, from January 2020 to November 2020; and permitted the District to unilaterally deplete Connor's awarded compensatory education by providing COVID-19 Compensatory Services.[2]

7.      The Hearing Officer erred in limiting the scope of the denial of FAPE claims to the two years immediately preceding the due process complaint, in a misapplication of the statute of

---

[2] The Pennsylvania Department of Education ("PDE") issued non-binding guidance to Local Education Agencies ("LEAs"), including school districts, describing a process to determine if students are owed COVID-19 Compensatory Services based on a student's regression due to alternative instructional models. PDE revised this guidance several times. The current guidance provides, "the term 'COVID-19 Compensatory Services (CCS)' refers to services as determined by an IEP team needed to remedy a student's skill and/or behavior loss and/or lack of progress that resulted from an LEA's inability to provide [FAPE] while using alternative instructional models due to the COVID-19 pandemic." *See* https://www.education.pa.gov/K-12/Special%20Education/FAQContact/Pages/COVID-19-Compensatory-Services.aspx.

limitations. Parents did not know, nor should they have known, of the District's failure to identify Connor's SLD until the November 2019 Reevaluation Report finding that Connor has a phonological-core deficit consistent with Dyslexia. Throughout Connor's time in the District, the District consistently assured Parents that Connor's programming met his needs. However, because of the District's failure to timely identify the SLD, Connor in fact received inappropriate instruction, his IEPs failed to provide appropriate goals and specially designed instruction, and he failed to make meaningful educational progress. The Parents' February 2021 due process complaint was well within two years of the date on which Parents knew or should have known of the District's denial of FAPE. The Hearing Officer's limitation of the scope of the denial of FAPE claims is based on an incorrect reading of IDEA's statute of limitations and Third Circuit case law, was clear legal error, and should be reversed. Compensatory education should be awarded for the entire period.

8.    Additionally, the Hearing Officer erred when she failed to find that the District denied Connor a FAPE from the start of the incorrect statute of limitations period (February 2019) through January 2020. The evidence showed that Connor performed below grade level, struggled academically, and that the District failed to implement Connor's reading program with fidelity or according to his IEP.

9.    Furthermore, the Hearing Officer erred by only awarding compensatory education due to the District's failure to provide Connor a PCA from May 2020 forward, even though Connor lacked consistent PCA support starting in January 2020 and the Hearing Officer explicitly found that the District denied Connor a FAPE in March and April 2020. The law and the facts presented in this matter do not support the Hearing Officer's exclusion of January to April 2020 and her consequent reduction in the compensatory education owed.

10.    Finally, the Hearing Officer erred in allowing the Family's compensatory education

4

award to be unilaterally diminished by the party that violated Connor's rights, affording the Defendant credit for COVID-19 Compensatory Services to reduce the Family's award. The Hearing Officer ordered:

> The District may elect to receive credit against the compensatory education award for the total number of [COVID-19 Compensatory Services] hours provided to Student through the end of the 2022-23 school year, up to a maximum of the total compensatory education hours awarded for the 2019-20 school year and 2020 ESY.

(Decision at 32-33). This method of calculating compensatory education is unsupported by the law and arbitrary. It provides undue control over the compensatory education award to the District and lacks appropriate safeguards to protect Connor's rights. Consequently, the Hearing Officer's limitation should be reversed.

11.     The Hearing Officer's Decision should be reversed to the extent that it: (a) misapplies the statute of limitations to limit the scope of the denial of FAPE to the two years immediately preceding the due process complaint despite the Parents' reasonable lack of knowledge under the applicable discovery rule and timely filing of their due process complaint; (b) fails to find that the District denied Connor a FAPE from February 2019 to January 2020 despite his lack of meaningful progress and the District's failure to appropriately implement his program; (c) awards compensatory education for Connor's lack of appropriate PCA support starting only in May 2020 as opposed to January 2020; and (d) inappropriately permits Defendant to unilaterally diminish or even eviscerate the Family's compensatory education by providing COVID-19 Compensatory Services. The Plaintiff, as the prevailing party, also seeks an award of statutory attorneys' fees and costs and other appropriate relief.

## II.   **Parties**

12.     Connor was born in 2010 and is an eligible student with disabilities under IDEA. He is also a Protected Handicapped Student under Section 504. He has resided in the District since

2017, including all time at issue in the hearing.

13.     Katherine and Kevin J. are Connor's parents. At all times relevant to this action, they have resided with Connor in Kennett Square, Pennsylvania, within the geographical boundaries of the District.

14.     The Kennett Consolidated School District is located at 300 East South Street, Kennett Square, Pennsylvania. The District is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. 22 Pa. Code Chapters 14 and 15; 24 P.S. Chapter 13.

## III.    **Jurisdiction and Venue**

15.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

16.     Plaintiff has exhausted administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued a special education due process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

17.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

18.     All of the Defendant's complained-of actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## IV.    **Additional Facts Supporting Liability**

6

19.     Connor is currently an eleven-year-old student who receives special education and related services in the District under a primary eligibility category of SLD, related to his phonological-core deficit consistent with Dyslexia, and under a secondary category of OHI related to his ADHD.

20.     Before attending school in the District, Connor resided and attended school in the state of Delaware. There, Connor received early intervention services.[3] Once he was school-aged, his local Delaware school district identified him as a student eligible for special education services under the category of Developmental Delay. This is a recognized eligibility category in Delaware but not in Pennsylvania.

21.     Before the 2017-2018 school year, the Family determined that it would be relocating within the District's boundaries. Despite the Family's requests, the District did not prepare a Pennsylvania IEP for Connor until a few weeks into the school year and delayed issuing its Prior Written Notice ("PWN") to initiate its evaluation until September 26, 2017. The District developed an inappropriate IEP for Connor dated September 12, 2017.

22.     During the 2017-2018 school year – Connor's second-grade year – Connor displayed frequent disruptive behaviors, difficulty attending to instruction, task refusal, and non-compliance. On multiple occasions, his teachers had to evacuate the other students from the classroom due to Connor's physically aggressive behaviors. Despite this, the District consistently informed the Parents that Connor's needs were met in its program.

---

[3] In Pennsylvania, "Early Intervention" services are provided to eligible children from birth to age three ("infants and toddlers"), Part C of the IDEA, 20 U.S.C. § 1431 *et seq.*, and from ages three to the age of beginners ("preschool early intervention"), 20 U.S.C. § 1412, 22 Pa. Code 14.151 *et seq.*

7

23.     The District issued its initial evaluation report for Connor on November 22, 2017 ("2017 ER"). The District did not conduct a comprehensive evaluation, citing Connor's behavior during evaluation sessions as an impediment. Specifically, the 2017 ER did not include accurate assessment of Connor's reading, math, and academic achievement abilities. The 2017 ER failed to consider the presence of a learning disability and its potential impact on Connor's academic achievement and behavior, despite the District's knowledge that Connor performed below grade level on certain measures of reading at the beginning of the 2017-2018 school year. By failing to further assess Connor's academic skills, the District overlooked what has ultimately been determined to be his primary area of need, a phonological-core deficit consistent with Dyslexia that was not identified until 2019. Instead, the District concluded that Connor was eligible for special education under the IDEA-recognized category of OHI only.

24.     On December 21, 2017, the District issued a revised IEP. Although the IEP now included a Positive Behavior Support Plan, which the September 2017 IEP lacked, it still failed to include appropriate academic and behavioral support. Again, the District reassured the Parents that its program met Connor's needs.

25.     However, due to the lack of appropriate behavioral and academic support, Connor missed significant instructional time and did not make meaningful progress during the 2017-2018 school year. The District regularly called the Parents to request that they take Connor home due to his behavior. Despite Connor's ongoing and escalating behaviors throughout the school year, the District did not conduct an updated Functional Behavior Assessment ("FBA") after November 2017. The District acknowledged that Connor required additional evaluation to address issues in school; however, instead of performing the recommended assessments, the District told the Family to obtain a mental health evaluation at a crisis center.

26.     Connor did not receive emotional support services or counseling services through-out his second-grade year because the District did not have an emotional support classroom in his assigned school building.

27.     The District finally agreed to provide Connor with a PCA on April 2, 2018. As Parents anticipated, Connor required the support of a PCA during the school day to begin to make progress in his program.

28.     At the start of his third-grade year (2018-2019), the District changed Connor's placement to a building which contains an emotional support classroom. The District issued a revised IEP for Connor on September 6, 2018, providing Connor with emotional support ("ES") services. The IEP team at the new school created a transition plan for Connor to start the year with all instruction in the ES classroom and slowly transition back into the general education classroom. The IEP team revised his program on December 7, 2018 and recommended supplemental emo-tional support and learning support services. Connor received small-group instruction for reading decoding in the learning support classroom and small-group math support in the emotional support classroom. Connor's behaviors improved in the new program, but he continued to perform below grade-level expectations academically. The District did not deliver his Wilson Reading System[4] programming appropriately.

---

[4] Wilson Reading System is a tier-3 (intensive intervention), structured literacy program based on phonological-coding research and Orton-Gillingham principles. *See* https://www.wilsonlan-guage.com/programs/wilson-reading-system/. It is distinct from other Wilson products such as Wilson Fundations, a tier-1 or tier-2 (prevention or early intervention) program. *See* https://www.wilsonlanguage.com/programs/fundations/. At the administrative due process hear-ing, the District's special education teacher testified that she was using and trained in Fundations rather than Wilson Reading System, that she was also using another program during Connor's learning support classes, and that she thinks there is a more intensive level of training for other Wilson programs that she lacks.

29.     On November 20, 2019, the District issued a Reevaluation Report ("2019 RR"). The 2019 RR concluded Connor's primary disability was not OHI due to ADHD, but SLD due to a phonological-core deficit that is characteristic of Dyslexia. After the 2019 RR, it was clear to the Family that Connor's academic performance was not simply a matter of willfulness, as the District had always portrayed it. Rather, Connor is a student with a disability that disrupts his psychological processes for reading and writing. This rendered him *unable* to complete the work expected of him.

30.     Based on the results of the 2019 RR, the District substantially revised Connor's IEP to include goals in multiple areas of reading, including decoding and phonological awareness, which were not in prior IEPs.

31.     Unfortunately, Connor's progress stopped in January 2020, when the District failed to provide consistent PCA support. Connor lacked appropriate PCA support from January through his return to in-person instruction in fall 2020. In fall 2019, Connor's assigned PCA left the District. The District was on notice that this PCA, who was going to school to become a teacher, would be leaving to complete her student teaching at that time. The District did not hire a new PCA to replace Connor's previous PCA. Instead, to Connor's detriment, it implemented a piece-meal schedule with multiple PCAs instead of one designated PCA.

32.     The District closed schools from March 13, 2020 through the end of the 2019-2020 school year due to the COVID-19 pandemic, providing virtual instruction. Connor received little to no benefit from his IEP while in a virtual learning environment from March 13, 2020 through November 12, 2020, when he began receiving in-person services once more. Connor refused to attend class and complete work throughout the entirety of virtual learning. The District failed to provide adequate support to re-engage Connor in his education. What is more, the District never

attempted to determine whether a safe or appropriate in-home or in-person option could be provided to support Connor's needs before November 2020.

33.    In response to the need for direction during the COVID-19 pandemic, in reliance on direction from the United States Department of Education, PDE issued guidance that a district's obligation to provide FAPE was not altered, waived, or excused.[5] A LEA, including a school district, must provide all related services as documented in the IEP to ensure each child is provided a FAPE during the COVID-19 pandemic.[6] If the IEP team determines a student needs a PCA as a related service, the LEA should ensure necessary safety and hygiene protocols are in place, then provide in-home support.[7] If in-home support cannot be provided due to health and safety concerns, this should be considered as part of the Compensatory Services determination.

34.    Connor's Parents, who lack any expertise in special education evaluation and programming, consistently participated in the evaluation and IEP development processes with the District. Despite this participation, they did not know of, or have reason they should have known of, his characteristics consistent with Dyslexia until they received the November 2019 RR, nor that his prior programs failed to meet all of his needs. They reasonably relied on the expertise of the District's staff members who were telling them Connor's program could meet his needs.

35.    On February 12, 2021, Parents filed an administrative due process complaint, seeking compensatory education and reasonable attorneys' fees and costs. Parents amended that complaint on February 23, 2021.

36.    The District filed a motion to limit claims based on IDEA's statute of limitations.

---

[5] https://www.education.pa.gov/K-12/Special%20Education/FAQContact/Pages/AddInfoCOVID19.aspx
[6] *Id.*
[7] *Id.*

The Hearing Officer required that Parents and the District each submit an Offer of Proof regarding the claims' scope. In an Interim Order dated March 25, 2021 ("Interim Order"), the Hearing Officer determined that an evidentiary hearing was required on the issue of date(s) on which Parents Knew or Should Have Known ("KOSHK") of the District's failure to provide FAPE.

37.    During the course of the hearing, in Spring 2021, based on guidance from the PDE, the District reviewed whether Connor is eligible for COVID-19 Compensatory Services due to regression during the periods of virtual learning and issued a Notice of Recommended Educational Placement ("NOREP"), which the Hearing Officer admitted into evidence. The District determined that Connor had regressed and failed to recoup skills in reading. It offered undefined COVID-19 Compensatory Services, to occur during the summer 2021 ESY program. The District offered COVID-19 Compensatory Services from July 6, 2021 to August 5, 2021, four days per week for three hours per day, the same hours of the ESY program, to which Connor is separately entitled. The District explained at the hearing that both ESY and COVID-19 Compensatory Services would be delivered in that same period. The District unilaterally made the determination; it did not include Parents and did not explain what COVID-19 Compensatory Services are or if they differ from or diminish the ESY program. The District failed to indicate which skill areas would be addressed, how and with whom, and failed to afford Parents *any* participation to determine the scope, nature, or timing of the COVID-19 Compensatory Services. At the hearing, the District offered nebulous statements about continuing to review whether students are entitled to COVID-19 Compensatory Services at later, unspecified, dates as well.

38.    On July 15, 2021, the Hearing Officer issued the Decision in which she limited Parents' claims to the two years immediately preceding the date of the due process complaint and awarded compensatory education for the District's violations of the IDEA. (Decision at 31-32).

## V.     Statutory Authority

39.     The purpose of the IDEA is "to ensure that all children with disabilities have available to them a [FAPE]," 20 U.S.C. § 1400(d)(1)(A); *see also Endrew F. v. Douglas County School Dist*. RE-1, 137 S. Ct. 988 (2017); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982). A FAPE must also be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved ... [and must be provided at] no cost to Parents." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S. Ct. 1994, 2001 (citing 20 U.S.C. § 1401(9) and (29)). The mechanism for providing a FAPE is the IEP. *See* 20 U.S.C. § 1412(4).

40.     The United States Supreme Court, in *Endrew F.*, recently clarified and expanded upon the standard initially set out in *Rowley* for determining whether a student's program is appropriate and explained:

> When all is said and done, a student offered an educational program providing "merely more than de minimis" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to 'drop out.'" The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.

*Id.* at 1001 (citation omitted). While declining to adopt a "bright-line" regarding the appropriateness of an IEP, the Court made clear that an IEP must be judged under the child's factual circumstances, and that the program must be appropriately ambitious in light of the child's potential. *Id.*

41.     An IEP must confer "significant learning" and "meaningful benefit" to the child. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-185 (3d Cir. 1988). This Third Circuit test is fully in accord with *Endrew F.*'s standards. *See K.D. by & through Dunn*

*v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

42.     It is also abundantly well-settled that "education" under IDEA extends beyond discrete academic skills, and includes the social, emotional, and physical progress necessary to provide the child with meaningful educational benefit toward levels of independence and self-sufficiency consistent with the child's cognitive potential. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 247 (3d Cir. 1999); *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 393-394 (3d Cir. 1996). *See also Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 239 (2009) (1997 amendments to IDEA were intended "to place greater emphasis upon improving student performance and ensuring that children with disabilities receive a quality public education."). Thus, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in all relevant domains under the IDEA, including behavioral, social, and emotional. *S.H. v. State-Operated School Dist. of the City of Newark*, 336 F.3d 260, 265 (3d Cir. 2003).

43.     The IDEA and its regulations establish a comprehensive format by which a child with a disability must be evaluated, a classification must be determined and an appropriate program of special education with "related services" must be developed and implemented. 20 U.S.C. § 1414; 34 C.F.R. § 300.300 *et seq*. The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304. The IEP must be developed jointly by school district officials and the child's parents as members of the IEP team. 34 C.F.R. § 300.321.

44.     In addition, at a minimum, an IEP must include a statement of the child's present levels of academic and functional performance, a statement of measurable annual goals designed to meet the child's needs to enable him or her to be involved in and make progress in the general

education curriculum, a statement of how progress on the goals will be measured, and a statement of the special education and related services and supplementary aids and services, based upon peer-reviewed research, to be provided to the child. 34 C.F.R. § 300.320.

45.     The IDEA statute and regulations provide for periodic re-evaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every 3 years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); 34 C.F.R. §300.303(b). School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

46.     Section 504 provides additional protections for children with disabilities by prohibiting discrimination against handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. § 104.1 *et seq.*

*47.*     Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities." 34 C.F.R. § 104.3. The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." *Id.* The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working." *Id.*

48.     Under Section 504, recipients of federal funds are required to "provide a free

appropriate public education to each qualified handicapped person who is in the recipient's juris-diction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).   The term "appropriate education" is defined as "the provision of regular or special education and re-lated aids and services that (i) are designed to meet individual educational needs of the handi-capped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

49.     If a child is identified by a school district under IDEA, *and* the provisions of that Act are fulfilled, the school district's responsibilities under Section 504 are also fulfilled. However, where a school district fails to conform to IDEA, or where a child is eligible under Section 504 but not IDEA, a school district must provide the services and protections required by Section 504. 34 C.F.R. § 104.32 - 36 *et seq.*; *Ridgewood*, 172 F.3d at 253; *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995).

50.     The IDEA and Section 504 provide that a party aggrieved has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any additional evidence presented by the parties. 20 U.S.C. § 1415(i)(2); *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 527 (3d Cir. 1995); *Shore Regional High Sch.*, 381 F.3d at 198-99. Moreover, both Section 504 and the IDEA permit recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415(i)(3)(B); 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

51.     The Third Circuit in *G.L. v. Ligonier Valley School Dist. Auth.*, 802 F.3d 601 (3d Cir. 2015), held that if parents file a Due Process complaint within IDEA's statute of limitations, i.e., within two years of the date the parents knew or should have known of a school district's

16

statutory violations, the student is entitled to a "complete remedy" for the District's violations for the entire period of educational deprivation, without reference to IDEA's limitations period. *Id.* at 625-26.

52.     The Hearing Officer plainly erred in finding that the Parents' claims prior to February 2019 – two years prior to the filing of the Due Process complaint – were barred by IDEA's statute of limitations. The Hearing Officer found that the Parents knew or should have known of the District's "actions" at the very moments they happened, and that the statute of limitations as to all violations prior to February 2019 began accruing at the moment those actions were taken. This analysis is patently incorrect as a matter of law. Pursuant to the Third Circuit's decision in *G.L.*, the IDEA limitations period runs from the discovery date on which a parent reasonably has knowledge or notice, or should have known, of the "injury" to the child by reason of the school district's failure to deliver a FAPE. *G.L.,* 802 F.3d at 604-05, 607-08, 611-15, 618, 620, 625-26. *See also E.G. v. Great Valley School Dist.*, 2017 WL 2260707 at *8 (E.D. Pa. May 23, 2017) (IDEA statute of limitations does not run from date of school district's "action," but from the date on which the parents knew or should have known that the action caused an educational injury to their child).

53.     The evidence was clear that the Family did not know, and should not have known, of the inappropriateness of Connor's program and the evaluations on which his program was based until November 2019, when the District informed them for the first time that Connor's primary disability is due to a phonological-core deficit consistent with Dyslexia, and not primarily due to his interfering behaviors. This revealed that his programming should have long included specially designed instruction, goals, and research-based instruction to support his particular reading weaknesses, supports that the Parents had no reason to believe Connor needed earlier. It was only when

they learned of his SLD that Parents first discovered, i.e., knew or should have known of, Connor's educational *injury* caused by the District's failures. Because November 2019 is well within two years of the filing of the due process complaint, the complaint was timely filed, and the complete period of educational deprivation is subject to full relief.

54.     Therefore, the Hearing Officer's decision that claims prior to February 2019 are time-barred under IDEA's statute of limitations is manifestly incorrect and must be reversed. The Court should award appropriate relief to the extent necessary to "make [Connor] whole" for the educational deprivations caused by those violations. *G.L.*, 802 F.3d at 624-26 (compensatory education must cover entire period of educational deprivation and "make the child whole" with a "complete remedy" for a school district's violations, without reference to IDEA's limitations period, if Parents file complaint within two years of KOSHK date).

55.     When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy for the student. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990); *Ridgewood*, 172 F.3d at 250 n.11; *M.C.*, 81 F.3d at 397. Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, 916 F.2d at 873 (holding that an award of compensatory education merely compensated the student for an inappropriate placement, belatedly allowing student to receive the remainder of his FAPE). The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

56.     In this matter, the Hearing Officer incorrectly determined that there was no

18

deprivation of FAPE from February 2019 to January 2020 despite Connor's inappropriate programming, his lack of meaningful progress, and the lack of fidelity with which the District provided his reading instruction. Accordingly, compensatory education should be awarded for this period based on the District's failure to provide a FAPE.

57.     The Hearing Officer correctly held that Connor was denied a FAPE and is entitled to compensatory education due to the District's failure to provide PCA support. However, the Hearing Officer erred in awarding Connor compensatory education beginning only in May 2020 rather than January 2020. Due to his disabilities, Connor was unable to access his education during the period when the District inconsistently staffed Connor's PCA, and from the time school closed until he became eligible to return to in-person instruction. The Hearing Officer determined that a start date of May 2020 for compensatory education would reflect the time reasonably required for the District to rectify the problem:

> The reasonable rectification period through May 1, 2020 accounts for a number of factors: the initial brief school closures; the need for the District like all other LEAs to make rational decisions regarding, and begin to implement, alternative programming for its students in light of the sudden and eventual long-term closures; and the District's lack of access to Student's mental health records that would have provided important information to professionals regarding Student's needs during remote instruction after the difficulties surfaced.

(Decision at 30). However, the record lacks support for this rectification period. The District was not appropriately addressing PCA staffing before the pandemic. It did not make any effort to provide in-person or in-home support to Connor during the pandemic until November 12, 2020, when he began receiving in-person services once more. The record also reflects that the District had ample access to any necessary records.

58.     Indeed, the District provided inconsistent and ineffective PCA support well before the pandemic, starting in the middle of the 2019-2020 school year, when Connor's dedicated PCA

left the District. Time to rectify the violation need not be subtracted from compensatory education when a District already knows of the Student's needs and should have been addressing them all along. *See Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist.*, 963 F.Supp.2d 427, 439 (E.D.Pa. 2013). Here, the District was already ineffectively providing PCA support before the onset of virtual instruction, despite its advance notice that Connor's dedicated PCA was leaving the District.

59.     Moreover, Connor's need for PCA support was memorialized in the December 4, 2019 IEP, and in previous IEPs, such that the District should not have reasonably required any additional medical information to understand that Connor's disabilities required the support of a PCA well before the pandemic. The Decision penalizes the Family for not providing access to records that the District already had and/or was not entitled to receive, and it overlooks that the Parents have always been present and active members of the IEP team (a fact that the Hearing Officer incorrectly used to dismiss claims based on the statute of limitations). Therefore, when computing hours of compensatory education due to Connor, the Hearing Officer erred in not making the award coextensive with the full duration of deprivation.

60.     The Hearing Officer also erred by allowing Defendant to reduce the compensatory education award by providing COVID-19 Compensatory Services. This credit is entirely arbitrary and contrary to settled law. Pennsylvania district courts have held that a student's parent should determine the nature and scope of compensatory education as long as it takes the form of any appropriate developmental, remedial or enriching instruction. *Heather D. v. Northampton Area School Dist.*, 511 F.Supp.2d 549 (E.D.Pa. 2007); *Keystone Central School District v. E.E.*, 438 F.Supp.2d 519 (M.D.Pa. 2006) (parents should be permitted to arrange for compensatory education without the need to "incorporate the District in the implementation and use of the

20

compensatory education award [as] it is illogical to force the student to receive compensatory education through the District, which is the entity that failed to provide him with FAPE in the first place."). Further, "Mandating participation with or through the District would only expose the parties to further tension and potential future litigation." *Id.*

61.   COVID-19 Compensatory Services are services described in *non-binding* guidance from PDE.[8] COVID-19 Compensatory Services are provided by the District as determined necessary by an IEP team, with no dispute resolution or procedural safeguards. There is no requirement that transportation be provided for a student to access COVID-19 Compensatory Services. It is entirely possible that Defendant could recommend that the entire compensatory education award from the Decision be replaced by COVID-19 Compensatory Services, consisting of inappropriate services, and then offer those services only during times that are inaccessible or inconvenient for the Family, or that negate other owed services, without any transportation. Indeed, at the time of the administrative hearing, the District had already recommended vague services that impermissibly overlapped with Connor's entitlement to ESY services. Moreover, the Family has no way to ensure that the offered services would target appropriate areas of need or be provided by appropriately trained staff. Finally, PDE has revised its non-binding guidance on COVID-19 Compensatory Services at least three times since the start of the pandemic, leaving the Family with no assurance that the COVID-19 Compensatory Services mechanism that exists today will still be in place in the future.

62.   The United States Department of Education has unequivocally affirmed that students remain entitled to a FAPE even during the COVID-19 pandemic.

---

[8] *See* https://www.education.pa.gov/K-12/Special%20Education/FAQContact/Pages/COVID-19-Compensatory-Services.aspx.

63.     The IDEA requires an independent review of the administrative Decision and permits this Court to grant the relief sought by Plaintiff, since the statute expressly endows courts with broad authority to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B); 34 C.F.R. § 300.516(c)(3).

64.     Plaintiff was the prevailing party in the due process proceeding and is therefore entitled to an award of reasonable attorneys' fees. Plaintiff further expects to prevail in the present proceeding, thereby entitling Plaintiff to an award of statutory attorneys' fees and costs for the present proceeding.

## VI.    Conclusion

WHEREFORE, the Plaintiff respectfully requests that this Court:

1.     Assume jurisdiction over this action;

2.     Affirm the Hearing Officer's finding that the District denied a FAPE under the IDEA;

3.     Find that the District violated Section 504, in addition to IDEA;

4.     Reverse the decision of the Hearing Officer to the extent that it dismisses claims based on the statute of limitations with additional compensatory education to be ordered from September 2017 to February 2019;

5.     Reverse the decision of the Hearing Officer to the extent that it does not find a denial of FAPE from February 2019 to January 2020;

6.     Reverse the decision of the Hearing Officer to the extent that it fails to award five hours per day of compensatory education for each school day from January 2020 through Connor's return to in-person instruction;

7.     Reverse the decision of the Hearing Officer to the extent that it

inappropriately allows Defendant to reduce the compensatory education award by providing COVID-19 Compensatory Services;

        8.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

        9.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, and Pennsylvania law; and

        10.    Grant such other relief as this Court deems proper.

Respectfully submitted,

John W. Goldsborough, Esquire
PA ID No. 73063

Dennis C. McAndrews, Esquire
PA ID No. 28012

Jennifer P. Grobe, Esquire
PA ID No. 323085

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)

Attorneys for Plaintiff