## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Connor J., *through his parents*, Kevin J. and Katherine J.<br><br>     *Plaintiffs,*<br><br>  v.<br><br>KENNETT CONSOLIDATED SCHOOL DISTRICT<br><br>     *Defendant.* | CIVIL ACTION<br>NO. 21-4495 |

**PAPPERT, J.**                **February 1, 2023**

### MEMORANDUM

Connor J., through his parents, filed an administrative due process complaint against Kennett Consolidated School District alleging the District denied Connor a free, appropriate public education ("FAPE") from 2017 through the beginning of the 2020–2021 school year. (Compl. ¶ 4, ECF 1.) The Hearing Officer held that the statute of limitations barred recovery for violations that may have occurred before February of 2019, but found that the District denied Connor a FAPE during portions of the 2019–2020 school year, the summer of 2020, and the 2020–2021 school year. (*Id.* ¶ 5.) She awarded Connor five hours of compensatory education for each school day from May 1, 2020, through the end of the 2019–2020 school year, and for each day school was in session and Connor attended remotely during the 2020–2021 school year. (Hr'g Officer Op. 32.) The Hearing Officer also awarded sixty hours of compensatory education for the extended school year services for which Connor was eligible but did not receive during the COVID-19 school closure. (*Id.*)

Connor's parents bring this lawsuit under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, and Chapters 14 and 15 of the Pennsylvania Code.  Connor and the District filed cross-motions for judgment on the administrative record.  (ECF 13, 14.)  Connor's parents contend that the Hearing Officer erred when she: misapplied the statute of limitations by considering only the two years preceding the filing of the due process complaint; failed to find Connor was denied a FAPE from February 2019 to January 2020; failed to award compensatory education for the total time Connor was without a Personal Care Assistant ("PCA"); and incorrectly allowed the District to reduce Connor's compensatory education award by the COVID-19 Compensatory Services that Connor received or would receive in the future.  (*Id.* ¶ 5–6.)  For its part, the District thinks the Hearing Officer erred when she failed to consider state legislation concerning the District's obligations during the pandemic and misapplied state guidance surrounding COVID-19.  (Def.'s Br. Supp. Mot. J. Admin. R. 1, ECF 13-1.)

After thoroughly reviewing the underlying record and the parties' submissions, the Court concludes the Hearing Officer correctly found the District denied Connor a FAPE between March of 2020 and November of 2020.  Furthermore, she calculated an appropriate compensatory education award by factoring in both a reasonable amount of time for the District to address the denial, as well as the COVID-19 Compensatory Services provided to Connor.  However, the Hearing Officer erred in applying the statute of limitations, barring claims arising prior to February of 2019 related to Connor's Specific Learning Disability ("SLD") in reading.  But her error was harmless because the record and factual findings support the decision that Connor was not

denied a FAPE from September of 2017 through February of 2019.  The Court affirms the Hearing Officer's decision and the award of compensatory education.

I

Connor and his parents currently live in the Kennett Consolidated School District.  (Hr'g Tr. 59: 16–22.)  Connor has been diagnosed with Post-Traumatic Stress Disorder, anxiety, and various other health conditions.  (Hr'g Tr.  50:16; 51:22–57:2.)  He first received special education services and an Individual Education Plan ("IEP") during preschool in the Appoquinimink School District in Delaware.  (Hr'g Tr. 57:20–58:4.)  Connor attended MOT Charter in Delaware for kindergarten and first grade.  (Hr'g Tr. 58:8–10; 59:25–60:2.)  In kindergarten, Connor was given a disability classification of "Developmental Delay," and IEPs were developed throughout his time at MOT Charter to address his disability.  (Hr'g Tr. 59:2–9.)

A

<u>Second Grade: 2017–2018 School Year</u>

Connor and his family moved to Pennsylvania in the summer of 2017, and Connor started second grade at Kennett Consolidated School District's Greenwood Elementary School.  (Hr'g Tr. 61:3–11.)  The District implemented his Delaware IEP until the school could conduct an evaluation to determine his eligibility for special education services in Pennsylvania.  (Hr'g Tr. 64:12–19; S-6; S-7.)  An evaluation report was completed on November 22, 2017, which stated Connor had a primary disability category of "Other Health Impairment."  (S-11 at 45).  During his evaluation, Connor exhibited "extreme refusal behaviors."  (Hr'g Tr. 283:6–7.)  Connor's mother testified that she was told Connor's "behavior got in the way" of his evaluation and the

3

District was "not able to evaluate him." (Hr'g Tr. 71:9–10.)  The District warned that because of Connor's behavior during the evaluation, the November 2017 Report should be interpreted with "caution" because it was "difficult to get an accurate assessment of his academic functioning." (S-11 at 8.)

The November 2017 Report indicated that Connor displayed a Verbal IQ score of 100 (average) and a Non-Verbal IQ score of 83 (below average), with an IQ Composite Score of 90 (average). (S-11 at 9.)  Connor's Academic Achievement Assessment yielded a Composite Scaled Score of 69, a result in the "Very Poor" range. (S-11 at 10.)  However, the Report reiterated that Connor was uncooperative during the administration of the test, "so the results are not an accurate reflection of his true skills." (S-11 at 9.)  The evaluators found that Connor's academic results were in the poor to below average range, and his teachers reported "distractibility, task refusal and noncompliance, attention-seeking behaviors, and difficulty with writing tasks." (Hr'g Officer Op. 5.)  The Report found Connor required occupational therapy services as well. (S-11 at 16.)

The Report also included a Functional Behavioral Assessment to address Connor's "challenging behaviors." (S-11 at 20.)  The Report documented Connor's behavior as disruptive and non-compliant. (S-11 at 20.)  The Functional Behavioral Assessment indicated that "an accurate assessment of achievement skills (reading, math, written expression) and cognitive skills could not be ascertained" but that "based on data collection for his current academic IEP goals, he is making academic progress." (S-11 at 30.)  The District implemented a revised IEP in December of 2017 that addressed the needs identified in the evaluation. (S-14.)  The IEP noted that Connor

continued to perform "below grade level expectation" in reading.  (S-14 at 7.)  It states that the District provided Connor reading instruction from the Storytown Reading Series with decoding instruction four times a week using the Wilson Reading System. (S-14 at 6.)  Connor attended small reading group sessions with a reading specialist to specifically work on decoding skills and an afternoon reading class focusing on fluency. (S-14 at 6.)

Connor exhibited behavioral issues throughout second grade, both in school and at home.  (Hr'g Tr. 66:10–67:15.)  His behavior resulted in classroom evacuations, necessitating Connor's early pick-up from school.  (P-34 at 9.)  Connor's mother communicated with the school about his behavioral and emotional issues roughly once a week.  (Hr'g Tr. 69:7–12.)

Working with Connor's parents, the District continued to tweak Connor's IEP throughout the winter and spring of 2018.  (S-25 at 2.)  Connor's mother requested a Personal Care Aide ("PCA") for her son, and although the District originally resisted, Connor was given a PCA by the end of the school year.  (Hr'g Tr. 79:10–25; S-25 at 2.) With the PCA's assistance, things got "much better."  (Hr'g Tr. 80:5.)  Connor's report card indicates he finished the year with Performance Levels of "Not Yet Proficient" in Reading and Writing, and "Proficient" in Mathematics.  (S-47 at 5.)  The Hearing Officer found that Connor was ineligible for extended school year services through the District over the summer.  (Hr'g Officer Op. 9.)  Connor attended a private extended school year program at Centreville Layton School.  (S-22, S-23.)

B

Third Grade: 2018–2019 School Year

Beginning in third grade, the District placed Connor in New Garden Elementary School, which had an emotional support classroom.  (Hr'g Tr. 82:17–24.)  Behaviorally, Connor did very well; academically, he struggled.  (Hr'g Tr. 83:21–84:1.)  Reading and math proved difficult, and he consistently had issues regarding the completion of homework.  (Hr'g Tr. 84:1–5, 92:17–21.)  The District revised Connor's IEP in September of 2018 and implemented an updated IEP in December of 2018.  (S-24 at 1, S-32.)  Despite reported struggles—Connor's homeroom teacher commented that he was performing "below grade level in reading, writing, and math"—his November 2018 report card displayed grades ranging from A+ to B.  (S-32 at 7, 9.)  Connor finished the year with Performance Levels of "Not Yet Proficient" in Reading, Writing, and Mathematics, and grades in those subjects of A+, B, and B, respectively.  (S-47 at 3.)  That summer, Connor again attended extended school year at Centerville Layton School.  (Hr'g Tr. 85:11–19.)

C

Fourth Grade: 2019–2020 School Year

In the fall of 2019, Connor's IEP included "Emotional Support and Learning Support for reading" while he participated in regular education for all other subjects.  (S-35 at 2.)  Connor received occupational therapy twice a week and support from a PCA.  (S-35 at 2.)  The District reevaluated Connor to determine his continued eligibility for special education and to gain updated information regarding his abilities.  (S-35 at 1).  The District published the Reevaluation Report on November 20, 2019.

(Hr'g Tr. 86:17–22.)  During the "Standardized Achievement Testing," Connor "willingly participated in most testing tasks, was focused, and appeared to put forth his best effort."  (S-35 at 23.)  The assessment's "[r]esults are believed to be reliable and valid estimates of [Connor's] functioning."  (S-35 at 23.)

As part of the November 2019 Reevaluation, the District administered the Wechsler Individual Achievement Test.  (S-35 at 23.)  Connor scored in the "Below Average" range on the Total Reading Composite, in the "Average" range on the Written Expression Composite, and in the "Above Average" range in the Mathematics Composite.  (S-35 at 23-25.)  An "ability-achievement discrepancy analysis" demonstrated Connor's "performance in Word Reading, Pseudoword Decoding, and Oral Reading Fluency" were "significantly below what would be predicted based upon his Average range cognitive abilities."  (S-35 at 24.)  Connor's "Comprehensive Test of Phonological Processing"—which tests phonological abilities related to reading— showed test results in the poor, average, and below average ranges on three separate subtests.  (S-35 at 25.)  The Reevaluation Report explains that these "deficits suggest a phonological-core deficit that is likely hindering [Connor's] development of decoding skills, sight word acquisition, and overall oral reading fluency performance.  Findings are characteristic of Dyslexia, and under IDEA, Connor qualifies for special education services with a Specific Learning Disability in word-level reading skills."  (S-35 at 26; Hr'g Tr. 87:2.)  The Report concluded Connor's SLD was his primary disability category, while his Other Health Impairment was now a secondary disability category.  (S-35 at 26, 32.)  After the Reevaluation Report, a new IEP was developed to address his weakness in reading. (S-35 at 28; S-38.)

The Reevaluation Report further suggested that Connor's PCA access be "systematically faded." (S-35-28.) However, before that could happen, Connor's usual PCA left the District. (Hr'g Tr. 90:6–12.) As a result, the District used rotating aides to assist Connor rather than providing him with one designated replacement. (Hr'g Tr. 90:16–91:7.) The lack of continuity in his PCAs increased Connor's behavioral issues. (Hr'g Tr. 88:17–89:24.)

In March of 2020, school moved online due to the COVID-19 pandemic, but virtual learning "really didn't exist" for Connor. (Hr'g Tr. 92:25.) Connor's IEP team decided it was not appropriate to remove his PCA service from his IEP at that time due to the disruptions caused by the pandemic. (Hr'g Tr. 385:10–16.) At the outset of virtual learning, Connor completed the packets of work assigned to the students, but he was soon unable to participate. (Hr'g Tr. 93:1–21.) Connor struggled to sit in front of his computer and learn remotely, so his parents requested a PCA come to the home. The School District did not provide one, despite an aide being recommended in his IEP. (Hr'g Tr. 93:16–25, 94:15–17.) As a result, Connor did not usually attend virtual class. (Hr'g Tr. 236:14–15.) His fifth-grade teacher, Sarah Hannagan, left time open in her schedule every morning for Connor to meet with her virtually one-on-one from 9:00 to 9:15 a.m., but Connor only attended these individual meetings three or four times. (Hr'g Tr. 236:14–18.) The school offered to have an aide present for Connor virtually, but given Connor's difficulty using the computer for virtual learning, a virtual aide was of no assistance. (Hr'g Tr. 94:21–95:11.) Connor's mother contends her son received "absolutely zero education" while Connor was learning from home. (Hr'g Tr. 94:8.) Connor's report card from the 2019–2020 school year shows grades through the second

trimester only.  (S-47.)  Connor earned Bs in Reading, Writing, and Mathematics and demonstrated a Performance Level of "Not Yet Proficient" in each of those subjects.  (S-47.)  According to Connor's mother, the summer school offered during 2020 "didn't do anything" for Connor because it "was just papers that he didn't really do."  (Hr'g Tr. 94:2–4.)

## D

### Fifth Grade: 2020–2021 School Year

Connor began his fifth-grade year remotely.  (Hr'g Tr. 96:3–4).  When the District was able to phase students back into the classroom in November, it deemed Connor eligible for in-person teaching because remote and hybrid models were not meeting Connor's needs.  (S-41 at 2.)  An updated IEP was implemented in November, addressing Connor's continuing reading and emotional difficulties.  (S-44 at 32–41.)  The Hearing Officer determined that the parties have resolved all claims after November of 2020.  (Hr'g Officer Op. 28.)

## II

### The IDEA and Section 504[1]

When reviewing an administrative hearing officer's decision under the IDEA, a district court applies a "modified *de novo*" standard.  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  Conclusions of law receive plenary review.  *Carlisle Area*

---

[1] Again, the Parents proceed under the IDEA, Section 504 of the Rehabilitation Act, and Chapters 14 and 15 of the Pennsylvania Code.  Chapter 14 of the Pennsylvania Code adopts and implements the IDEA, while Chapter 15 implements Section 504 of the Rehabilitation Act.  *See* 22 Pa. Code § 14.102(a); 22 Pa. Code § 15.1a); *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 WL 390864, at *10–15 (M.D. Pa. Jan. 28, 2015) (finding Chapters 14 and 15 as coextensive with the IDEA and Section 504, respectively.)

*Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995).  A hearing officer's factual findings are given "due weight" and are considered *prima facie* correct.  If the Court departs from those findings, it must explain why.  *D.S.*, 602 F.3d at 564.  The Court must accept a hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."  *Id.* (emphasis omitted) (internal quotation omitted).  "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (quotation omitted).  The party seeking review of the Hearing Officer's decision bears the burden of persuasion before the district court as to the challenged claims.  *Id.* at 270.

The IDEA requires states receiving federal education funding to provide a FAPE to all children with disabilities.  20 U.S.C. § 1412(a)(1).  "A FAPE . . . includes both 'special education'"—instruction specially designed to meet the child's unique needs—and "related services"—"the support services required to assist a child to benefit from that instruction."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citations omitted) (cleaned up).  School districts and parents must collaborate to create an IEP, individually fashioned for each special education student.  20 U.S.C. §§ 1412(a)(4), 1414(d).

To meet its FAPE obligation, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.,* 580 U.S. at 399.  The IEP must confer a meaningful benefit to the student and that benefit must be substantial.  *T.M. on behalf of T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 800 (E.D. Pa. 2017) (citations omitted).  The Court will "give

deference to the District where it offer[s] a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of the circumstances." *E.G. v. Great Valley Sch. Dist.*, No. 16-5456, 2017 WL 2260707, at *8 (E.D. Pa. May 23, 2017) (internal quotations omitted). Whether the District met its FAPE obligation is a question of fact. *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). If a school district knows or should know that a child is not receiving a FAPE, it has a duty to correct the deficiency. *M.C. on behalf of J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). If the District fails to do so, "a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Id.* "[T]his formula harmonizes the interest of the child, who is entitled to a free appropriate education under IDEA, with those of the school district, to whom special education and compensatory education is quite costly." *Id.*

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To establish a violation of Section 504, Connor's parents must prove that (1) Connor was disabled; (2) he was "otherwise qualified" to participate in school activities; (3) the District received federal financial assistance; and (4) Connor was excluded from participation in school, denied the benefits of school, or subject to discrimination at school. *See Ridley,* 680 F.3d at 280.

Section 504 entitles disabled students to a FAPE as well, *A.W.,* 2015 WL 390864, at *15; 34 C.F.R. § 104.33(a), but a violation of the IDEA is not a *per se* violation of Section 504.  *See Andrew M. v. Delaware Cnty. Off. of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007) (When a plaintiff brings claims under Section 504 and the IDEA, "a plaintiff must still prove that there was a violation of [Section 504].")  Connor's parents have not shown their son was excluded from participation in, denied the benefits of, or subject to discrimination at the school, other than the alleged denial of a FAPE.  Because the parents' have not argued a separate Section 504 claim, but the same denial of a FAPE claim under the IDEA, the Court will analyze the denial of the FAPE under the IDEA only.  *See K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 256 (3d Cir. 2018) (analyzing a claim under the IDEA where plaintiffs' Section 504 "allegations simply repackage those underlying the IDEA claim").  Moreover, because the Court finds Connor was denied a FAPE under the IDEA from March of 2020 to November of 2020, a second analysis regarding a FAPE denial under Section 504 would be redundant.  *See Andrew M.,* 490 F.3d at 350 (holding that when a state fails to provide a disabled child with a FAPE, it violates Part B of the IDEA; however, it also violates Section 504 because it is denying a disabled child a guaranteed education merely because of the child's disability).

III

A

Under the IDEA, a "parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C.

§ 1415(f)(3)(C); *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 609 (3d Cir.

2015).  The IDEA's two-year statute of limitations period also applies to Section 504

cases.  *P.P.*, 585 F.3d at 737.  The IDEA provides exceptions to the two-year statute of

limitations for situations that involve misrepresentations by a school district or when a

district withholds required disclosures from parents.  *See* 20 U.S.C. § 1415(f)(3)(D).

Neither of these exceptions are at issue in this case.  Statute of limitations claims are subject

to plenary review.  *Id.* at 735.

As the Third Circuit stated in *G.L. v. Ligonier Valley School District Authority*,

the "plain meaning of . . . Section 1415(f)(3)(c) provides that parents who have been

unable to secure relief for alleged violations through informal channels and are

resorting to requesting a due process hearing must do so 'within 2 years of the date the

parent or agency knew or should have known about the alleged action that forms the

basis of the complaint.'" *G.L.*, 802 F.3d at 612 (quoting 20 U.S.C. § 1415(f)(3)(c)).  "When

fashioning a statute of limitations, a legislature may choose as the date from which the

limitations period begins to run either the date the injury actually occurred, an

approach known as the 'occurrence rule,' or the date the aggrieved party knew or

should have known of the injury, that is, the 'discovery rule.'"  *Id.* at 613 (citing *Knopick

v. Connelly,* 639 F.3d 600, 607 (3d Cir. 2011)).  The IDEA's "discovery rule provides that

the date the statute of limitations begins to run 'is not the date on which the wrong that

injures the plaintiff occurs, but the date on which the plaintiff *discovers* that he or she

has been injured.'"  *Id.* (emphasis in original) (quoting *Oshiver v. Levin, Fishbein,

Sedran & Berman,* 38 F.3d 1380, 1385 (3d Cir.1994)).

The limitations period of § 1415(f)(3)(c) "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." *Id.* at 614 (quoting *Merck & Co. v. Reynolds,* 559 U.S. 633, 653 (2010)).  The Third Circuit further confirmed:

> [O]nce a violation is reasonably discovered by the parent, any claim for that violation, however far back it dates, must be filed within two years of the "knew or should have known" date. If it is not, all but the most recent two years before the filing of the complaint will be time-barred; but if it is timely filed, then, upon a finding of liability, the entire period of the violation should be remedied. In other words, § 1415(f)(3)(c) . . . reflects a traditional statute of limitations.

*Id.* at 620–21.  Therefore, the Court must first determine the "knew or should have known" date in order to determine if the Complaint was filed within the two-year window.

## B

The District argues that the Hearing Officer correctly applied the statute of limitations when she limited Connor's recovery to violations occurring in the two years prior to the filing of the due process complaint.  The Hearing Officer found "[t]he record does not support a conclusion that the District's November 2017 [Evaluation Report] and November 2019 [Reevaluation Report] solely form the basis of assessing the Parents' knowledge in this case." (Hr'g Officer Op. 23.)  She suggested Connor's parents "were aware since Student's enrollment in a different state that Student had weaknesses in areas of reading, and that the District maintained identical IEP goals upon Student's transition."  (*Id*.)  Connor's parents contend that they became aware of the District's actions giving rise to their due process complaint with the November 20,

2019 Reevaluation Report, revealing their son's primary reading disability.  (Pls.' Br. Supp. Mot. J. Admin. R. 13, ECF 14-1.)

The District contends that the knew-or-should-have-known date "is the date of each action or alleged inaction by the school district that forms the basis of a complaint."  (Def.'s Br. Opp'n Pl.'s Mot. J. Admin. R. 1, ECF 16.)  But that merely restates the occurrence rule; the limitations period begins to run when the parents discovered or should have discovered that Connor was allegedly being denied a FAPE.  *See* 20 U.S.C. § 1415(f)(3)(C).

It is similarly incorrect that the knew-or-should-have-known date is triggered if the parents were "fully aware of the District's action as they occurred," as the Hearing Officer states.  (Hr'g Officer Op. 24.)  The Hearing Officer concluded that knowledge of the school's programming started the statute of limitations clock, writing that "the evidence simply does not support a conclusion that the Parents lacked knowledge of the District's special education programming for Student."  (Hr'g Officer Op. 24.)  But knowledge of the school's programing does not trigger the statute of limitations.  *See Downingtown Area Sch. Dist. v. D.S.*, No. CV 20-0892, 2022 WL 523563, at *8 (E.D. Pa. Feb. 22, 2022) ("Mere knowledge of the education a school is providing a child is insufficient; what parents must discover is that the education amounts to a violation.").

A parent's "permanent omniscience of the District's actions" is not enough, for as one court observed:

> A parent is theoretically aware every day [of] the District's "action" of providing a FAPE to their child because they send him or her to school and the child may return home at the end of the day.  The knowledge the child attends school each day cannot be all § 1415(f)(3)(c) requires to file a complaint. A parent cannot challenge the District's provision of a FAPE without a violation.

> Section § 1415(b)(6)(B) requires the parent to allege a "violation" based on the District's alleged actions. Then the parents must "discover" the District's actions violated their child's right to a FAPE.

*E.G. v. Great Valley Sch. Dist.*, No. CV 16-5456, 2017 WL 2260707, at *6, *8 (E.D. Pa. May 23, 2017).

The Hearing Officer also erred in concluding that the parents' knowledge of Connor's behavioral and academic struggles in school provided sufficient notice to trigger the statute of limitations. *See* (Hr'g Officer Op. 23). Parents' knowledge of their child's struggles in a subject is not akin to knowing their child is being deprived of an appropriate education in that subject. Even if Connor's parents were aware of his educational shortcomings before the November 2019 Reevaluation Report, there is nothing in the record to indicate those deficiencies were not being addressed by an appropriate IEP. The Hearing Officer did not perform "the kind of 'fine-grained analysis' that is necessary to determine discovery dates," and incorrectly applied the statute of limitations. *Damarcus S. v. D.C.*, 190 F. Supp. 3d 35, 45 (D.D.C. 2016). To uphold the Hearing Officer's conclusion would conflate the discovery and occurrence rules and eliminate the opportunity for relief to parents engaged in their child's education, but not aware that the school's actions potentially violated the statute until more than two years had passed.

## C

Connor's parents' claim the District denied him a FAPE regarding his SLD in reading, and that they could not have known of such a violation until the SLD was discovered in November of 2019. The administrative record does not reveal a point prior to the Reevaluation Report, identifying Connor's SLD, when reasonably diligent

parents would have known or had reason to know the District was denying Connor a FAPE. The Reevaluation Report put the parents on notice that Connor suffered from an unaddressed SLD, suggesting that the District may have denied their child a FAPE.

The record shows Connor's "parents were engaged in asking about and providing input for Connor' educational program." (Hr'g Tr. 199:19–23). They relied on and worked with the District to implement Connor's IEPs. There is nothing in the record that would indicate to Connor's parents that the District may have been violating their child's rights to a FAPE prior to November of 2019. Because they filed their due process complaint within two years of the November 20, 2019 Reevaluation Report showing the district may not have been providing Connor a FAPE because of his SLD, their claims related to his SLD are not barred by the statute of limitations.

IV

<u>The District Provided a FAPE from 2017 through 2019</u>

When considering claims brought under the IDEA, "a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010). Given this discretion, the Court need not remand the matter to the Hearing Officer to determine whether the District denied Connor a FAPE prior to February of 2019, the date before which the Hearing Officer failed to analyze the District's actions. The administrative record and the Hearing Officer's findings of fact are sufficiently detailed to show the District did not deny Connor a FAPE from the fall of 2017 through February 2019. The Court also agrees with the Hearing Officer's conclusion that the District did not deny Connor a FAPE from February of 2019 through March of 2020.

17

A

The School District Did Not Delay in Evaluating Connor in 2017

First, Connor's parents argue that the District "delayed in evaluating and issuing a Pennsylvania-compliant IEP until December 2017." (Pl.'s Mot. J. Admin. R. 15.) Under the IDEA, an IEP must be in effect for an IDEA-eligible child at the start of the academic year. *See* 20 U.S.C. § 1414(d)(2)(A); 34 C.F.R. § 300.323. When a student transfers to a new school district from another state, "the new school district must provide a FAPE that include[s] comparable services to those described in the student's prior IEP until the district conducts an evaluation . . . and develops, adopts, and implements a new IEP." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 564 (E.D. Pa. 2013), *aff'd in part*, 581 F. App'x 141 (3d Cir. 2014).

The District did just that. From the start of the 2017–2018 school year, Connor received special education services pursuant to his Delaware IEP. (Hr'g Tr. 355:19–23.) The District issued a Notice of Recommended Education Placement/Prior Written Notice Form to Connor's parents on September 6, 2017, stating the District would implement an IEP, dated September 12, 2017, that was based on his September 28, 2016 IEP; input from his parents; a review of his records; and other data collected. (S-6 at 2.) His parents signed off on this plan. (S-6 at 3.)

The District issued a Prior Written Notice for Initial Evaluation and Request for Consent Form on September 26, 2017, which the parents signed and returned on October 6, 2017. (S-9 at 1.) Upon receipt of the parents' written consent, the District had 60 days to evaluate Connor and return an Evaluation Report to the parents. *See* 34 C.F.R. § 300.301(c)(1); (S-9 at 2). The District sent the Evaluation Report to the

18

parents on November 27, 2017—52 days after receipt of consent—and an updated IEP based on the Evaluation Report was implemented on December 21, 2017.  (S-14 at 1.) Connor always had an IEP, and there was no impermissible delay in implementing a new one.

Furthermore, the initial September 2017 IEP was reasonably calculated to aid Connor in making progress under the circumstances.  When examining a student's IEP, "evaluations of [its] adequacy . . . can only be determined as of the time it was offered to the student, and not at some later date." *Coleman,* F. Supp. 2d at 563–64 (citations omitted).  The September 2017 IEP identified "Reading decoding" and "Fine motor needs" as weaknesses related to Connor's disability; reading and occupational therapy goals were put in place to specifically address those needs.  (S-7 at 9, 16–19.)  The District implemented an IEP that was appropriate given the circumstances and provided Connor a FAPE during this time.

B

The District Continually Provided a FAPE Prior to the 2019 Reevaluation Report

i

*The 2017 Evaluation Was Not Flawed*

The November 2017 Evaluation's failure to reveal an SLD does not vitiate the evaluation or resulting IEPs.  *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012) ("The mere fact that a subsequent evaluation . . . yielded a different result . . . does not necessarily render the earlier testing inadequate.").  Each evaluation is a "snapshot in time," as one of the school psychologists phrased it.  (Hr'g Tr. 316:5–6.) Although that psychologist, Brittany Hunter, testified that "[d]iagnostic clarity . . . was

impossible to achieve [at that time] because of the pretty extreme refusal behaviors," she further stated that the 2017 "evaluation accurately painted a picture of what his functioning looked like at that time." (Hr'g Tr. 315:15–18, 316:8–10.) As Dr. Janice Pietrowicz, the school psychologist who performed Connor's 2017 evaluation stated, "We weren't looking at a student who could possibly fall into [categories besides Other Health Impairment] at this stage." (Hr'g Tr. 347:16–18.) When asked whether the November 2017 Evaluation Report was incorrect because it did not conclude Connor suffered from an SLD, Dr. Pietrowicz responded, "No. I still stand by that report. It was the appropriate classification." (Hr'g Tr. 358:15–18.) The Court has no reason to doubt the education professionals' testimony that Connor's evaluation was properly conducted and accurately captured his abilities at that time, notwithstanding his behavioral issues during the evaluation.

ii

*Connor's IEPs Were Appropriate*

Connor's parents contend that the IEPs implemented prior to the November 2019 Reevaluation were flawed because the District was not aware of Connor's SLD in reading. The Hearing Officer determined Connor received a FAPE during the 2018–2019 school year, prior to the discovery of his SLD. (Hr'g Officer Op. 24–25.) Specifically, Connor "was provided a program of learning and emotional support to address social/behavioral/emotional needs, occupational therapy weaknesses, and reading skill deficits, in addition to additional writing supports." *Id.* at 24. Connor's IEPs prior to the November 2019 Reevaluation Report provided him a meaningful benefit, despite the school not knowing of his SLD at the time.

Connor's parents argue that his February 2019 IEP was "significantly flawed" because the District had not yet identified Connor's SLD, and the IEP therefore did not contain specific goals related to his SLD in reading.  However, the Hearing Officer correctly found the District provided Connor with "individualized special education services and intensive regular education services targeting known deficits."  (Hr'g Officer Op. 24.)   The Hearing Officer also determined Connor "made progress on all of the annual IEP goals by the end of that school year . . . including mastery of the reading fluency goal."  (*Id.*)  She found this "meaningful in light of Student's circumstances." (*Id.*)

The Court will not substitute its own notions of proper educational policy for the educational expertise of the school officials, including those professionals who testified that Connor's program was appropriate in light of his behavioral issues.  *See, e.g.*, *Ridley,* 680 F.3d at 268.  Brittany Hunter "absolutely" believed Connor's IEPs were appropriate.  (Hr'g Tr. 314:21.)  Dr. Pietrowicz testified that "it was just the behaviors that were the primary issue. . . .  It was very difficult to get past some of those significant behaviors.  And it was more – it was very important to get him in a place emotionally, behaviorally in order to see what he was capable of from an academic standpoint."  (Hr'g Tr. 347:8–14.)

The record supports the Hearing Officer's view that there "was no evidence presented from which one could conclude that the District should have taken steps to reevaluate [Connor], or that [Connor's] program was inappropriate in any respect, during the second half of the 2018–2019 school year."  (Hr'g Officer Op. 24–25.)  This conclusion extends to the entire period ranging from the fall of 2017 to March of 2020,

when students began virtual learning due to the COVID-19 pandemic.  At all times, the District implemented IEPs that were calculated to help Connor make behavioral and academic progress.  Under the IDEA, "maximal or optimal educational services or results are not guaranteed," but "a school district must, in designing an IEP, identify goals for meaningful improvement relating to a student's potential."  *Coleman,* 983 F. Supp. 2d at 563 (citing *P.P.,* 585 F.3d at 729–30).  The District did so.

V

<u>The District Provided a FAPE from January 2020 through March 2020</u>

Connor's parents also contend that the Hearing Officer erred in finding that Connor was not denied a FAPE from January 2020 to March 2020, during which time Connor had inconsistent PCAs.  (Pls.' Br. Supp. Mot. J. Admin. R. 19-10, ECF 14-1.) Connor's mother testified that the "weaning of his aide . . . was very problematic."  (Hr'g Tr. 88:21–23.)  But the Hearing Officer found that the District's use of different PCAs "must be balanced against the decision to fade that particular support."  (Hr'g Officer Op. 25.)  Connor's IEP from December of 2019 states that Connor's PCAs would "be systemically faded based on Connor's current progress in behavior and social-emotional functioning to further promote independence in the school setting."  (S-39 at 2.)  The Hearing Officer found that the period from the "second semester through March 2020 when schools closed provides that reasonable period of time." (Hr'g Officer Op. 25.)

Again, whether the District met its FAPE obligation is a question of fact.  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).  Giving the Hearing Officer's factual findings due weight, her finding that the District's use of multiple PCAs provided Connor a FAPE was not erroneous.  *See J.C. individually & on*

22

*behalf of J.C., a minor, v. Upper Darby Sch. Dist.*, No. CV 20-5030, 2022 WL 17324587, at *8 (E.D. Pa. Nov. 29, 2022) (finding that absent other evidence, "periodic inconsistency in providing a PCA" did not deprive student of "receiving meaningful educational benefits considering the individualized support" student was also receiving). The District continued to comply with Connor's IEP and provided a FAPE even after his prior PCA left the school in the middle of the year. (Hr'g Tr. 90:6–8.)

VI

The District Denied Connor a FAPE During Remote Learning

The Hearing Officer correctly determined Connor was denied a FAPE from March of 2020 through his return to in-person instruction in November of 2020 due to the lack of a PCA during remote learning. Once schooling moved online in March of 2020, Connor was without an in-person PCA as arranged for in his IEP. (S-39 at 1).

The District claims it complied with state regulations put in place during the pandemic requiring only that districts provide "continuity of education" when school went online in 2020. *See* 24 Pa. Stat. Ann. § 15-1501.8(c)(5); (Def.'s Br. Supp. Mot. J. Admin. R. 9–11, ECF 13-1.) But the District did not raise this argument before the Hearing Officer, thereby waiving it. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) ("axiomatic" that arguments raised for the first time on appeal are waived). Even so, the Court need not remand on this issue because the same statute requires districts to inform parents of the "plans for ensuring the student receives a free and appropriate public education as required under IDEA." 24 Pa. Stat. Ann. § 15-1501.8(c)(4). Because the statute requires that the District provide a FAPE consistent with the IDEA, it does not affect the Court's inquiry into whether the District denied Connor a FAPE.

The District also contends the Hearing Officer erred in considering Pennsylvania Department of Education guidance regarding in-home PCAs during the remote learning period (Def.'s Br. Supp. Mot. J. Admin. R. 9–11, ECF 13-1), feeling the guidance is inapplicable to actions taken prior to its issuance.  (*Id*.)  The guidance—published in the summer of 2020—stated that if "a student needs a PCA as a related service, the [District] should ensure necessary safety and hygiene protocols are in place prior to providing in-home support."  (Hr'g Officer Op. 26.)  The guidance also stated that PCAs should provide in-home service "if the IEP team determines a student needs a PCA." (Hr'g Officer Op. 26.)

The Hearing Officer correctly found that Connor's PCA had "clearly become necessary in the remote learning environment."  (Hr'g Officer Op. 25.)  While the Pennsylvania Department of Education guidance is helpful, Connor's FAPE denial is evident without considering it.  The record demonstrates that from the time classes went virtual, Connor's educational plan was no longer reasonably calculated to enable him to make appropriate progress.  *See Endrew F.,* 580 U.S. at 399.  Connor's plan conferred no meaningful educational benefit during this time because he could not work remotely without an in-person PCA.  *See* (Hr'g Tr. 94:8).  Furthermore, even if the District was following local guidance on the provision of remote education, it knew, according to the District's Director of Special Education and Student Services, that Connor was not attending virtual class meetings and was "really struggling with getting online" and "struggling with participating in virtual learning."  (Hr'g Tr. 236:14–15, 372:12–14.)  "A school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a *de minimis* educational benefit

must correct the situation." *M.C.*, 81 F.3d at 397.  Because the District knew that Connor was not receiving more than a *de minimis* educational benefit without an in-person PCA, Connor is entitled to compensatory education.  *See id.*

VII

<u>The Awarded Compensatory Education Was Proper</u>

The Hearing Officer was correct that May 1, 2020, was a reasonable start date for the calculation of compensatory damages.  (Hr'g Officer Op. 30.)  The District must have been given reasonable time to adapt to Connor's needs while remote, and the Hearing Officer did not err in finding that less than two months was an appropriate amount of time.  *See M.C.,* 81 F.3d at 397 (A "disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.")  The period of March and April of 2020 was a reasonable amount of time for the District to discover that the absence of a PCA deprived Connor of a FAPE and to come up with a solution to rectify the problem.

Connor's parents claim it was incorrect for the Hearing Officer to allow the District to deduct any COVID-19 Compensatory Services (CCS) that it provided or will provide Connor from the awarded amount of compensatory education.  They cite a case stating that parents "may decide" how compensatory education is used, *Heather D. v. Northampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 559 (E.D. Pa. 2007), and another that held it would be "illogical to force [the student] to receive compensatory education through the District, which is the entity that failed to provide him with a FAPE in the first place." *Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.*, 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006).  However, these cases

25

emphasize that parents control the implementation of a compensatory education award; they do not limit the Hearing Officer's ability to factor into her award any compensatory services that the District already provided.

It was appropriate for the Hearing Officer to allow the District to subtract any COVID-19 Compensatory Services that have been or will be provided to Connor for the denial of a FAPE during the school closures.  These Compensatory Services have been or will be provided to recoup any skills lost during the remote period.  (Hr'g Tr. 387:6–16.)  The Pennsylvania Department of Education guidance defines CCS as services "needed to remedy a student's skill and/or behavior loss and/or lack of progress that resulted from [a Local Education Agency's (LEA's)] inability to provide Free Appropriate Public Education (FAPE) while using alternative instructional models due to the COVID-19 pandemic."  (Hr'g Officer Op. 28).  Lack of a PCA due to remote learning during the pandemic deprived Connor of a FAPE during the months of at-home schooling.  The CCS Connor received remedies that same loss due to the same cause: the COVID-19 pandemic.  When fashioning an award of compensatory education in this case, it was appropriate for the Hearing Officer to allow the District to credit the CCS provided to Connor.

## VIII

### Attorneys' Fees

Plaintiffs ask the Court to "order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs."  (Pls.' Br. Opp'n Def.'s Mot. J. Admin. R. 12, ECF 15.)  The Court will defer decision on that issue until Plaintiffs file a petition for attorneys' fees and costs and the District files its response.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.